# UNITED STATES DISTRICT COURT
# DISTRICT OF MARYLAND

| | |
|---|---|
| Jane Doe (HT-00001) | Case No. _____ |
| Plaintiff, | |
| v. | **Complaint and Demand for Jury Trial** |
| G6 Hospitality, LLC;<br>G6 Hospitality Franchising, LLC;<br>Andrews Hospitality, LLC;<br>Akshar Hospitality, LLC. | 1. 18 U.S.C. § 1595 |
| | 2. 18 U.S.C. § 2255 |
| DOES 1-10, | 3. Negligence |
| Defendants. | |

Complaint

## TABLE OF CONTENTS

TABLE OF CONTENTS .......................................................................................... 2

PLAINTIFF'S COMPLAINT ................................................................................... 3

   INTRODUCTION .................................................................................................. 3

   PARTIES ............................................................................................................... 3

   JURISDICTION AND VENUE ............................................................................ 4

   SEX TRAFFICKING OVERVIEW ...................................................................... 4

   STATEMENT OF FACTS ..................................................................................... 9

      Plaintiff was Trafficked ................................................................................. 9

      Sex Trafficking at G6 Hotels ...................................................................... 12

      Actual and Constructive Knowledge .......................................................... 16

      G6 and Andrews-Akshar Relationship ...................................................... 20

   FIRST CAUSE OF ACTION: TVPRA .............................................................. 26

      Claim 1: Andrews-Akshar Liability ........................................................... 26

      Knowingly Benefited .................................................................................. 26

      Participation in a Venture ........................................................................... 27

      The Venture Violated the TVPRA .............................................................. 27

      Actual or Constructive Knowledge ............................................................ 27

      Claim 3: G6 Liability ................................................................................. 27

      Knowingly Benefited .................................................................................. 27

      Participation in a Venture ........................................................................... 27

      The Venture Violated the TVPRA .............................................................. 28

      Actual or Constructive Knowledge ............................................................ 28

      Vicarious Liability ...................................................................................... 28

   SECOND CAUSE OF ACTION: CAVRA ......................................................... 28

   THIRD CAUSE OF ACTION: NEGLIGENCE ................................................. 29

   PRAYER FOR RELIEF ...................................................................................... 29

   JURY DEMAND ................................................................................................. 30

Complaint

# PLAINTIFF'S COMPLAINT

## INTRODUCTION

1. Plaintiff, Jane Doe HT-00001, files this civil lawsuit to seek compensation for the harms and losses she sustained as a result of being a victim of sex trafficking that occurred from the years 2014 through 2018, when she was 15 through 18 years of age. For several years, Plaintiff was subjected to untold atrocities, including rape, verbal and physical attacks, humiliation, fear, and sexual assault at hotels owned, operated, maintained, and controlled by the hotel defendants (and their agents and employees) named in this case.

2. Plaintiff was trafficked in a hotel owned, operated, and managed by Defendants1 G6 Hospitality, LLC & G6 Hospitality Franchising, LLC (together "G6"), Andrews Hospitality, LLC, and Akshar Hospitality, LLC ("Andrews-Akshar"). Plaintiff's trafficker rented hotel rooms for the purpose of engaging in sex trafficking.

3. As discussed herein, Defendants G6 and Andrews-Akshar each derived a financial benefit from widespread use of the Camp Springs Motel 6 for sex trafficking, including the trafficking of Plaintiff. Despite obvious and apparent signs of sex trafficking at the Camp Springs Motel 6, G6, and Andrews-Akshar continued renting hotel rooms to Plaintiff's trafficker and operated the Motel 6 in a way that enabled sex trafficking, including by creating a haven where traffickers could operate without disruption from hotel staff and with minimal risk of detection and traceability. Thus, these defendants are civilly liable to Plaintiff pursuant to federal anti-trafficking laws and statutory remedies.

## PARTIES

4. Plaintiff is a natural person, currently 27 years of age, who is currently a resident and citizen of Maryland.[1]

5. G6 Hospitality, LLC is one of the largest hotel franchisors in the world and offers its brand public lodging services through its affiliates, subsidiaries, and franchisees. The company

---

[1] Contemporaneously with the filing of this Complaint, Plaintiff is filing a Motion to Proceed Anonymously based on the inherently intimate and personal nature of the allegations. Plaintiff will provide her identity to counsel for the defendants upon entry of a protective order.

Complaint

also provides franchise opportunities for its hotel and motel brands through G6 Hospitality Franchising, LLC.

6. The G6 defendants are Delaware corporations, with headquarters in Carrollton, Texas. G6 does business in a systematic and continuous manner throughout Maryland, including this District and Division.

7. Andrews Hospitality, LLC is Maryland limited liability company, owning and operating a motel in this District and Division.

8. Akshar Hospitality, LLC is Maryland limited liability company, owning and operating a motel in this District and Division

9. The true names and capacities of Defendants DOES 1–10 are persons or entities whose true names, identities, and forms are currently unknown to Plaintiff. Plaintiff does allege that the principals and members of the Andrews-Ashkar defendants are responsible for the acts alleged herein, including under an alter-ego theory. Plaintiff will seek leave to amend this Complaint, as appropriate, to allege the true names and capacities of these fictitiously named Defendants when they are ascertained. Plaintiff is informed and believes, and thereupon alleges, that each of the fictitiously named Defendants DOES 1–10 is responsible for the conduct alleged in this Complaint and that, through their conduct, these fictitiously named Defendants actually and substantially caused Plaintiff's injuries and damages.

## JURISDICTION AND VENUE

10. This Court has original jurisdiction pursuant to 28 U.S.C. § 1331 because this action involves a federal question under the TVPRA.

11. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because one or more Defendants reside in this district and the primary activities that led to this suit took place in this district.

## SEX TRAFFICKING OVERVIEW

12. Human trafficking is a widespread and heinous crime that has deeply scarred the moral fabric of society. Often referred to as modern-day slavery, it represents a severe public

Complaint

health crisis of epidemic proportions. This exploitation disrupts communities, drives criminal activity, and devastates countless families. Each year, millions of people are trafficked across the globe, including within and into the United States.

13. One of the most harmful and destructive forms of human trafficking is sex trafficking. This involves using force, fraud, or coercion to force an individual into engaging in commercial sex acts. Even if no force, fraud, or coercion is involved, the exploitation of a minor for commercial sex is human trafficking.

14. Sex trafficking represents a large part of global human trafficking and is the predominant form of transnational modern-day slavery. It is estimated that 4.8 million people are victims of sex trafficking worldwide, with the United States being the leading country in driving demand.

15. Women and girls are disproportionately impacted by this modern form of involuntary servitude, making up 99% of victims in the commercial sex industry. Within the realm of sex trafficking, children are undoubtedly the most vulnerable. According to research from the Polaris Project, the average age at which sex trafficking begins is during adolescence, though disturbingly, it can start as early as infancy.

16. In 2018, more than half (51.6%) of active criminal human trafficking cases in the United States involved sex trafficking of children only. According to the National Center for Missing and Exploited Children, reports of suspected child sex trafficking increased by 846 percent between 2010 and 2015. A survey found that in 2015, 55 percent of minors who became victims of sex trafficking met their traffickers through a website or mobile app. Increasingly, predators use the internet and social media to identify, target, and exploit vulnerable children.

17. The harms suffered by victims of sex trafficking are profound and extensive. Victims are routinely subjected to sexual violence, physical abuse, and repeated criminal exploitation, often by multiple offenders. They are frequently forced to endure extreme physical deprivation, including inadequate food, sleep, and medical care, and are exposed to serious health risks such as HIV/AIDS, hepatitis, and substance dependency. Psychological consequences are pervasive and severe, including depression, post-traumatic stress

5

disorder, anxiety, and persistent fear. Survivors often experience cognitive and memory impairments, engage in self-destructive behaviors, and face social marginalization that intensifies the lasting impact of their victimization.

18. Traffickers employ illicit schemes, intricate networks of corporate entities, and rapidly evolving technologies to carry out their operations. More than a decade ago, human trafficking was identified as the third-largest and fastest-growing criminal enterprise worldwide, driven by the combination of high profits and relatively low risk.

19. Human trafficking produces an estimated $150 billion in profits each year, approximately two-thirds of which stem from the sexual exploitation of trafficked individuals.

20. While traditional trafficking methods persist, online technologies now give traffickers an unprecedented ability to exploit larger numbers of victims and advertise across geographic boundaries. The rise of online exploitation has fundamentally transformed the commercial sex trade. Where buyers once had to leave their homes to engage in in-person transactions, the internet now enables remote access and anonymity. Online advertising has reshaped the commercial sex market and, in doing so, has contributed significantly to the growth of domestic sex trafficking.

21. The exploitation of sex trafficking victims is not confined to traffickers and sex buyers alone; rather, human trafficking enterprises rely on the participation of ostensibly legitimate businesses to operate effectively. Traffickers understand that the viability of their operations often depends on access to and affiliation with mainstream commercial enterprises. When such businesses place profits above human welfare and become complicit, they facilitate continued exploitation and enable traffickers to adapt, innovate, and expand methods for profiting from the exploitation of human beings.

22. There is little question that sex trafficking operations cannot succeed without the assistance, support, or facilitation of other business organizations. Human trafficking is therefore accurately understood as a criminal enterprise that relies on mainstream commercial partners to flourish.

23. In recent years, traffickers have increasingly relied on a broad array of willing accomplices, including ostensibly legitimate businesses that knowingly profit from commercial

Complaint

relationships with trafficking ventures they know—or reasonably should know—are associated with the exploitation and misuse of human beings.

24. Private-sector involvement in human trafficking is pervasive. Traffickers utilize lodging establishments to house victims and carry out forced commercial sex acts, rely on financial institutions to process and launder proceeds, and exploit internet and social media platforms to recruit victims and market their services. Criminal organizations also engage financial and legal entities to structure and manage their operations. Technological advancements in computing, software, and digital infrastructure further enable trafficking enterprises and enhance their profits.

25. For decades, sex traffickers have operated openly within hotels and motels throughout the United States. Throughout this period, traffickers conducted their activities on hotel properties while major hospitality corporations failed to take reasonable action to prevent or disrupt trafficking. Instead, many hotels and motels limited their responses to nominal anti-trafficking initiatives while continuing to collect substantial profits from trafficking occurring on their premises.

26. In fact, hotels constitute the primary locations in which sex trafficking takes place. This prevalence is not coincidental. For years, traffickers have exploited hotels as low-risk, high-profit environments. In 2014, 92 percent of reports to the Human Trafficking Hotline involved allegations of sex trafficking occurring in hotels. Moreover, hotels have been found to account for over 90 percent of the commercial sexual exploitation of children.

27. The hotel industry, including Defendants, derives substantial profits from participation in ventures that they knew or should have known were engaged in conduct violating 18 U.S.C. § 1591(a). Such participation includes renting hotel rooms used to harbor sex trafficking victims on a recurring basis and providing internet services that traffickers utilize to advertise and solicit victims for commercial sex acts. This arrangement constitutes a mutually beneficial relationship between Defendants and traffickers, sustained by the sexual exploitation of victims.

28. In light of the established link between hotels and sex trafficking, government agencies and nonprofit organizations, including the United States Department of Homeland

Complaint

Security, the National Center for Missing and Exploited Children, the Polaris Project, various state Attorney Generals, Love 146, EPCAT, among others,  have undertaken extensive efforts to educate the hotel industry, regarding best practices for identifying and responding to trafficking. Indicators of sex trafficking in hotel environments are well documented, follow consistent patterns, and are readily detectable by appropriately trained personnel. Comprehensive, hotel-specific toolkits have been developed to enable staff at all levels to recognize and respond to trafficking indicators. Throughout a guest's stay— from check-in to check-out—traffickers and victims display recognizable warning signs.

29. Industry participants have access to substantial publicly available information concerning the prevalence of human trafficking in hotel settings, including industry-focused reports prepared by organizations such as the Polaris Project.

30. Education and training are among the most effective means of preventing and combating sexual exploitation and human trafficking. As ECPAT concluded: "The hospitality industry is in a unique position to identify and report human trafficking due to its perceived anonymity. Traffickers believe they can go unnoticed while exploiting victims across the globe in hotels— ranging from budget properties to luxury resorts. From check-in to check-out, there are a number of indicators victims and exploiters exhibit during the time they are on a hotel property."

31. This same conclusion is echoed by others who seek to eliminate sex trafficking in the hospitality industry, including the American Hotel Lodging Association: "Hotel employees who have undergone training are more aware of trafficking when it happens – and are more willing to report it – than those who have not been trained." In reference to hoteliers, ECPAT observed: "If they do nothing to raise awareness or to prevent child trafficking, they risk becoming an indirect and unintentional conduit for the abuse that takes place."

32. The well-known and pervasive relationship between sex trafficking and the hotel industry necessarily informs what Defendants knew or should have known about the trafficking of Plaintiff at Defendants' hotel.

33. Addressing the widespread growth of human trafficking requires accountability for those who knowingly profit from participation in ventures that a reasonable person knew or

Complaint

should have known were engaged in human enslavement. Civil litigation therefore serves as a critical tool in any comprehensive approach to combating sex trafficking in America.

## STATEMENT OF FACTS

**Plaintiff was Trafficked**

34. Tragically, before Backpage was seized by the Department of Justice, Plaintiff was trafficked by advertisements on Backpage in 2014-2018. She was compelled to engage in unlawful sex acts, often multiple times in a day.

35. Plaintiff's trafficker used a combination of force, fraud, coercion, enticement and drugs to cause her to engage in commercial sex, forcing her to turn over all proceeds to him.

36. These advertisements included photographs of Plaintiff and descriptions of sexual services available for purchase. Buyers responded directly to these advertisements and arranged meetings at hotel rooms rented by her trafficker at the Motel 6 located at 5701 Allentown Rd. Camp Springs, MD 20746.

37. At the time the advertisements appeared, Plaintiff was a child, vulnerable and wholly dependent on her trafficker for food, shelter, and necessities.

38. Her trafficker would arrange a room from which she was trafficked multiple times in a single day.

39. He had the cooperation of the hotel staff and would regularly accompany Plaintiff to lobby, to interact with and housekeeping staff, to frequently request additional towels, to pay in cash to extend a reservation, or conduct the business necessary to continue to exploit her.

40. The trafficker used a combination of coercion, manipulation, grooming, psychological pressure, threats of violence, and the provision of drugs and alcohol to cause Plaintiff to engage in commercial sex acts.

41. Plaintiff wasn't the only young girl being trafficked out of this location. During the time of her trafficking, it was an open secret that this location offered a "discreet" setting for the exploitation of other young girls and women.

42. While trafficked Plaintiff was given drugs, to dull her senses and keep her compliant. She became dependent on these drugs and thereafter became aware of the drug activities

Complaint

happening at this Motel 6. In addition to providing the setting for her exploitation, Motel 6 in Camp Springs was known as a reliable location to procure illegal substances.

43. The criminal activity at this location was so open and obvious that even casual observers, i.e., those spending a single night, were aghast and would post reviews about it.

44. On June 2, 2016: a Yelp reviewer posted: "the door appeared to have been kicked in at least once, and the prostitutes were loitering around the building."

45. On July 3, 2016: a Yelp reviewer posted: "I notice there is lot of activity in the area, quite unusual for a motel or hotel at 1am in the morning. There are also about 7 males peering down from the second floor landing, again strange and unusual for this time of the morning . . . I'm standing behind a young lady checking into a room. It is then that it hits me based on the way she and other ladies in the area are scantily dressed - these women are dressed like prostitutes. I suddenly have a moment of epiphany why there is so much activity on the premises this late at night."

46. And little has changed. On August 14, 2024, a Bookings.com reviewer posted: "I didn't like the property. It was dirty crackheads in the laundry room, smoking crack, prostitutes, walking all through there people outside with loud music playing you couldn't get no rest."

47. On July 2, 2023, a Bookings.com reviewer posted: "Drugs every were prostitutes room nasty front office smell like drugs needles on the grounds I will never stay here again."

48. On May 29, 2023, a Bookings.com reviewer posted: "The place has to many ppl hanging outside till all times of night. Room was small beds uncomfortable. Hot water not very hot fridge didn't work . Vending machines only take cash. Ppl kept calling my room all night not saying anything and walking past knocking on my door complained to hotel desk they said there's nothing they can do. Didn't feel safe or family friendly prostitutes outside the hotel gate it was a awful experience trying to have aweekend gateway with my spouse wouldn't recommend I stayed from Friday to Monday maids never knocked for any services never picked up my garbage I left outside the door sheets had stains. When I arrived at 9pm due to flight being delayed I try to check in they say there only taking cash so I had to walk in the dark down the street to ATM."

49. On June 21, 2025, an Expedia.com reviewer posted: "thought I was getting a deal with the price and proximity to Motel 6, but nah, this spot is the projects. I felt like crimes are comitted here daily. I know for sure people are living out of their hotel rooms (why you just hanging out on the stairwell). Was pretty sure I saw a few prostitutes collecting their belongings and leaving."

50. During the period in which Plaintiff was trafficked at the subject Motel 6, her trafficking had profound and visible effects on her appearance, demeanor, movements within the hotel, and interactions with others. These effects manifested in numerous signs of trafficking that were obvious and apparent to Motel 6 staff and management.

51. Plaintiff exhibited clear indicators of trafficking in her interactions with her traffickers, hotel staff, and others, including a nervous and fearful demeanor; signs of paranoia and disorientation; refusal to make eye contact; limited access to clothing; malnourishment; appearing under the influence of illegal drugs; untreated medical issues; inability to move freely throughout the hotel or communicate independently; and submissive behavior, including seeking permission from her trafficker for basic needs and allowing traffickers to speak on her behalf.

52. Plaintiff further displayed an inability to provide logical responses to basic questions, reliance on obviously scripted answers, lack of personal possessions, sleep deprivation, and poor hygiene.

53. These indicators matched well-recognized "red flags" of human trafficking in the hotel industry and were known to each Defendant to be signs of sex trafficking in a hotel environment.

54. As a direct and proximate result of being trafficked as a child, Plaintiff suffered severe and lasting physical and psychological injuries. Those psychological, emotional, and relational injuries caused by her trafficking as a minor are severe, ongoing, and enduring.

**Sex Trafficking at G6 Hotels**

55. G6's actual knowledge is *not* limited to a general awareness of the problem of sex trafficking in the hotel industry. They have known, since well before Plaintiff's trafficking that sex trafficking was ongoing and widespread at G6 properties.

56. Use of G6 branded properties for sex trafficking is well known to the G6 Defendants. Motel 6 hotels are one of the five chains most frequently identified as a site of sex trafficking in federal criminal complaints.[2]

57. Public statements of G6 confirm that they knew that sex trafficking is a problem and that they retained control over the response of their branded hotels to this problem. The G6 Defendants recognize that "[t]raffickers often use hotels and motels for sex trafficking activities due to the privacy extended to guests."[3] They also acknowledged the significant role G6 has in the three D's: deterring, detecting, and disrupting sex trafficking in their branded hotels."[4]

58. Information that has become public through news stories establishes the entrenched and pervasive nature of G6's role in providing a venue where sex trafficking has continued unabated for years. G6 monitored news stories and online reviews for indicia of criminal activity at their branded locations, including sex trafficking. Examples of news stories confirm the widespread presence of sex trafficking, prostitution, and related criminal activity at G6 hotels:

    a. In late 2003, a trafficker set up a sex trafficking venture at a Motel 6 in Connecticut in which two (2) young women were sold for sex eight (8) to ten times per day.[5]

---

[22] Sarah Meo and Louise Shelley, *Sex Trafficking and Hotels: Why there is a Need for Effective Corporate Social Responsibility* (Nov. 11, 2021), https://www.globalpolicyjournal.com/blog/11/11/2021/sex-trafficking-and-hotels-why-there-need-effective-corporate-social-responsibility

[33] *G6 HOSPITALITY ANTI-HUMAN TRAFFICKING TRAINING*, http://g6propertycollateral.com/wp-content/uploads/2020/02/G6_TheRoomNextDoor_Training_V12b_NoFacilitator.pdf

[4] *Id.*

[5] Amy Fine Collins, Sex Trafficking of Americans: The Girls Next Door, Vanity Fair (May 2011), https://www.vanityfair.com/news/2011/05/human-trafficking-201105.

Complaint

b. In April 2009, a sex trafficking venture operated out of a Motel 6 in Toledo, Ohio.[6]

c. In approximately September 2011, sex traffickers set up an operation at a Motel 6 in Toledo, Ohio to sell fifteen (15) and sixteen (16) year old girls for sex.[7]

d. From approximately 2012 through October 2014, two (2) men engaged in a criminal sex trafficking venture of children which operated in part out of a Motel 6 in Harvey, Illinois.[8]

e. In January 2012, a couple was charged with prostitution and pimping at a Studio 6 in Roswell, GA[9]

f. Police rescued an eighteen (18) year old girl from a sex trafficker in February 2012, at a Motel 6 in Portland, Oregon.[10]

g. The FBI investigated and arrested several individuals in December 2012, for the victimization and human trafficking of several young women and a juvenile at a Motel 6 in Madison, Alabama[11]

h. The Orange County Human Trafficking Task Force busted a criminal enterprise in December 2012 that was selling women for sex out of a Motel 6 in Anaheim, California[12]

---

[6] Five Toledoans Indicted On Sex Trafficking Charges, ABC7Chicago.com (Nov. 7, 2010), https://abc7chicago.com/archive/7771888/.

[7] Mark Reiter, Two Toledoans Accused Of Juvenile Sex Trafficking, The Blade (Jun. 1, 2010), https://www.toledoblade.com/Courts/2012/06/02/2-Toledoans-accused-of-juvenile-sex-trafficking-1.html

[8] Press Release, U.S. Dept. of Justice, Two Aspiring Rappers Charged With Operating Sex-Trafficking Ring In Chicago And Suburbs (Jan. 15, 2016), https://www.justice.gov/usaondil/file/813771/download

[9] Couple arrested for pimping, prostitution, Appen Media (Jan. 17, 2012), https://www.appenmedia.com/public_safety/couple-arrested-for-pimping-prostitution/article_473fe798-1b3d-5c6f-b230-547e3e5c4651.html

[10] Press Release, U.S. Dept. of Justice, Tacoma Pimp Sentenced To 25 Years For Sex-Trafficking Two Victims (Nov. 20, 2013), https://www.justice.gov/usao-or/pr/tacoma-pimp-sentenced-25-years-sex-trafficking-two-victims

[11] *FBI Investigates Human Trafficking At Madison Hotel,* WHNT News 19 (Dec. 7, 2012), https://whnt.com/2012/12/07/fbi-investigates-human-trafficking-at-madison-motel/.

[12] *Suspects Busted in Anaheim Sex Ring,* ABC13 Eyewitness News (Dec. 5, 2012), https://abc13.com/archive/8909784.

13

Complaint

i.   In approximately March 2013, sex traffickers began operating a sex trafficking venture out of Motel 6 locations in Bangor and Portland, Maine[13]

j.   Beginning in approximately May 2013, a fifteen (15) year old runaway was trafficked for sex out of the Motel 6 on Caton Avenue in Baltimore, Maryland[14]

k.   In Richmond County, Georgia a man was arrested at a local Motel 6 in October 2013 and charged with sex trafficking of two young women[15]

l.   Police investigated a sex trafficker in March 2014 and ultimately charged him for his crimes including, but not limited to, selling a seventeen (17) year old girl for sex out of a Motel 6 in Roseville, Minnesota[16]

m.   In May 2014, two (2) traffickers were arrested at a Motel 6 in Monterey, California after a twenty-one (21) year old woman escaped from their captivity[17]

n.   In the summer of 2014, two (2) girls ages fifteen (15) and sixteen (16) were taken from a children's shelter by a sex trafficker and trafficked out of a Motel 6 in Cutler Bay, Florida[18]

o.   A Las Vegas man was charged with sex trafficking two (2) victims, including a seventeen (17) year old girl, in January 2015, out of a Motel 6 in Rapid City,

---

[13] Danielle McLean, What Drives Maine Sex Traffickers' Inhumanity, Bangor Daily News Maine Focus (Sept. 12, 2016), https://bangordailynews.com/2016/09/12/mainefocus/what-drives-maine-sex- traffickers-inhumanity

[14] Anne Kramer, Man Faces Prison Time For Sex Trafficking Baltimore Teen, WBAL News Radio (Apr. 10, 2014), https://www.wbal.com/article/106578/2/man-faces-prison-time-for-sex-trafficking-baltimore-teen.

[15] UPDATE: Man Arrested For Sex Trafficking, WRDW.com On Your Side, (Oct. 3, 2013), https://www.wrdw.com/home/headlines/Man-arrested-for-sex-trafficking-226301261.html.

[16] Man, 25, Is Accused Of Trafficking Teens, Twin Cities Pioneer Press (Jun. 5, 2014), https://www.twincities.com/2014/06/05/man-25-is-accused-of-trafficking-teens-2/

[17] Felix Cortez and Amy Larson, Monterey Police: 2 Human Sex Traffickers Arrested After Victim Escapes Motel,KSBW8 (May 9, 2014), https://ksbw.com/article/monterey-police-2-human-sex-traffickers-arrested-after-victim-escapes-motel/1054172.

[18] David Goodhue, Next Stop For Man Accused Of Sex Trafficking 2 Teens: Federal Court, Miami Herald (Sept. 2, 2015), https://www.miamiherald.com/news/local/news-columns-blogs/deadline-miami/article33360843.html.

Complaint

Nevada[19]

    p.   In February 2015, two (2) men were arrested for sex trafficking a fourteen (14) year old girl at a Motel 6 in Seekonk, Rhode Island[20]

    q.   A married couple was indicted in June 2015, for their roles in sex trafficking minor children ages seventeen (17), sixteen (16), and fifteen (15) years old out of a Motel 6 in Everett, Washington[21]

    r.   In Tuscaloosa, Alabama police rescued a fourteen (14) year old girl from a Motel 6 in June 2015, and a grand jury subsequently charged her assailant with human trafficking and rape[22]

59. These articles represent only a limited and non-exhaustive sample. Numerous additional reports document sex trafficking and related criminal activity at G6-branded hotels. Moreover, upon information and belief, the G6 Defendants are aware of substantial additional law enforcement activity involving trafficking at their properties that was not reported in the media. In total, state and federal law enforcement agencies have prosecuted several hundred traffickers, involving hundreds of victims, for sex trafficking and forced prostitution conducted at G6-branded properties.

60. News stories, online reviews, guest complaints, public statements, and law enforcement efforts establish that, at the time Jane Doe was trafficked at the Camp Spring Motel 6, G6 knew or should have known:

---

[19]Las Vegas Man Charged With Human Trafficking In Rapid City, Argus Leader (Jan. 17, 2015), https://www.argusleader.com/story/news/crime/2015/01/17/las-vegas-man-charged-human-trafficking-rapid-22city/21922915/.

[20] Stephen Peterson, RI Man Gets Jail In Sex-Trafficking Case Involving Seekonk Motel (Oct. 28, 2016), http://www.thesunchronicle.com/news/local_news/ri-man-gets-jail-in-sex-trafficking-case-involving-seekonk/article_d7a25494-9d21-11e6-8f94-63e5c74facb3.html.

[21] Diana Hefley, County Investigating 45 Ongoing Human Sex Trafficking Cases, HeraldNet (Jun. 26, 2015), https://www.heraldnet.com/news/county-investigating-45-ongoing-human-sex-trafficking-cases/. https://www.heraldnet.com/news/county-investigating-45-ongoing-human-sex-trafficking-cases/.

[22] https://www.tripadvisor.com/Hotel_Review-g41519-d244102-Reviews-Motel_6_Boston_North_Danvers-Danvers_Massachusetts.html

Complaint

    a.   The use of G6 branded properties for sex trafficking was not limited to one location or geographic region but was a widespread problem;

    b.   Commercial sex work occurring at G6 branded properties involved trafficking and compelled prostitution;

    c.   G6 franchisees and hotel staff were not taking reasonable steps to deter, detect, and disrupt known or probable sex trafficking occurring at G6 hotel properties;

    d.   Their efforts, if any, to stop facilitating sex trafficking in G6 branded properties were not effective; and

    e.   They were, by their acts and omissions, facilitating sex trafficking at G6 branded properties by providing venues where that trafficking was occurring widely and without sufficient detection or deterrence.

61. Despite the continually mounting evidence that sex trafficking at G6 branded properties was ongoing and growing, G6 did not change course. G6 chose to continue earning revenue and profits from renting out space in their hotels as a venue for trafficking.

**Actual and Constructive Knowledge**

62. At all relevant times, G6 and Andrews-Akshar knew or should have known that sex trafficking was prevalent at the Camp Springs Motel 6 because trafficking occurred openly on the premises, followed well-established patterns, and presented with obvious indicators that G6 and Andrews-Akshar recognized and acknowledged as signs of sex trafficking in a hotel environment.

63. The Franchisee and/or G6 knew that the subject Motel 6 was in a high-crime area with a high incidence of criminal activity. Law enforcement records indicate obvious and apparent criminal activity on the property.

64. Online reviews and articles confirm the presence of criminal activity associated with sex trafficking at the subject Motel 6.

65. Based on these hotel reviews, the hotel staff at the Camp Springs Motel 6, on information and belief, reacted with indifference to guest reports about the signs of criminal activity, thereby facilitating criminal activity at the hotel.

Complaint

66. Upon information and belief, Plaintiff's traffickers, along with other traffickers, repeatedly selected the subject Motel 6 to conduct sex trafficking activities because its policies and practices created a favorable environment for trafficking and because hotel staff routinely ignored or failed to act on clear indicators of trafficking. As a result, traffickers were able to operate with minimal effort to conceal their activities, based on an implicit understanding that their conduct would not be questioned or disrupted by the subject Motel 6.

67. Based on news reports, hotel reviews, guest complaints, and records of law enforcement calls, multiple victims were trafficked at the subject Motel 6 before and during Plaintiff's trafficking. Upon information and belief, traffickers followed repetitive and routine methods during their stays at the subject Motel 6, and numerous trafficking "red flags" were observed by hotel staff and management. These indicators included, among others, payment in cash or prepaid cards; unusually high volumes of men, who were not registered guests, entering and exiting rooms at all hours; extended stays despite arriving with few personal possessions; and other conduct consistent with the well-established indicators of sex trafficking described above.

68. During the period that Plaintiff was trafficked at the Camp Springs Motel 6, there were obvious signs that her traffickers were engaged in sex trafficking:

    a. Plaintiff's trafficker or a buyer would pay for the room with cash or prepaid credit cards.

    b. Plaintiff would appear to be with a significantly older "boyfriend" and have lower quality clothing compared to males she was with.

    c. At check-in, the hotel staff observed Plaintiff exhibit evidence of being verbally threatened and emotionally abused.

    d. Plaintiff's trafficker would reserve multiple rooms.

    e. She would have few or no personal items when checking in.

    f. Plaintiff would often be dropped off at the hotel by her trafficker.

    g. The room Plaintiff was trafficked in would be rented out for an hourly stay or a long-term stay that did not seem normal.

Complaint

h.  Plaintiff could be seen loitering on the property and appearing to monitor the area.

i.  Plaintiff had heavy foot traffic of non-hotel guests and older males coming from the room she was trafficked in.

j.  Plaintiff would try not to be seen by the front desk.

k.  After Plaintiff checked out, hotel cleaning staff noticed large amounts of sex paraphernalia like condoms and lubricant in the trash.

l.  Plaintiff prevented housekeeping staff from entering the room for regular cleaning.

69. There were obvious signs of trafficking consistent with the modus operandi of her trafficker, which included well-known "red flags" for trafficking in a hotel.

70. Employees at the Camp Springs Motel 6, including management-level employees, observed or were made aware of these obvious signs of Plaintiff's trafficking while acting within the scope and course of their employment.

71. As such, G6 and Andrews-Akshar knew or was willfully blind to the fact that Plaintiff was being trafficked at the subject Motel 6.

72. Given these obvious signs, G6 knew or should have known about the trafficking activity that resulted in the trafficking of Plaintiff pursuant to their policy or protocol under which Andrews-Akshar and hotel staff were required to, and upon information and belief did, report suspected sex trafficking to G6.

73. G6 also knew or should have known about the trafficking of Plaintiff based on the numerous tools through which they monitored and supervised the subject Motel 6.

74. G6 also had constructive knowledge of the activity that resulted in the trafficking of Plaintiff at the subject Motel 6 because that activity was accompanied by such recognized "red flags" of sex trafficking that it was readily detectable through the exercise of ordinary diligence.

75. If G6 had exercised ordinary prudence in areas of operations over which they retained control or in which they directly participated, they would have detected and stopped benefiting from the illegal activities of Plaintiff's traffickers at the subject Motel 6.

76. Andrews-Akshar also facilitated widespread trafficking at the Camp Springs Motel 6, including the trafficking of Plaintiff in ways including, on information and belief:

Complaint

a.  developing a relationship with Plaintiff's trafficker, and creating an understanding that he could operate at the hotel without risk of interference;

b.  continuing to provide rooms, services, and assistance to the trafficker in the face of obvious "red flags" of trafficking of Plaintiff and other victims;

c.  accommodating specific requests made by Plaintiff's trafficker;

d.  serving as lookouts for Plaintiff's trafficker;

e.  leaving doors unlocked or ajar for the benefit of the trafficker;

f.  accepting bribes from the trafficker;

g.  allowing Plaintiff's trafficker to check in without showing identification;

h.  observing Plaintiff in obvious distress but continuing to provide support to her trafficker;

i.  allowing buyers who were not registered hotel guests to freely access the hotel without requiring identification or any other method of tracking;

j.  using inappropriate and inadequate practices for hiring, training, supervising, managing, and disciplining front-line staff regarding issues related to human trafficking;

k.  following a pattern or practice of failing to contact law enforcement despite obvious indicia of criminal activity, including sex trafficking, occurring on site;

l.  implicitly encouraging the activities of traffickers by creating an environment where they did not need to incur the burden of taking significant steps to conceal their activities, but, instead, could operate without concern for detection or interference by the hotel staff;

m.  providing these traffickers with the cover of a legitimate business where they could operate without having to divert significant time and resources to avoid detection or interference by hotel staff

77. Andrews-Akshar acts and omissions, which were motivated by a single-minded focus on profit-maximization, showed serious indifference to and callous disregard for the rights of sex trafficking victims, including Plaintiff.

78. Andrews-Akshar knew that sex trafficking causes immeasurable harm to victims and, nonetheless, knowingly or recklessly engaged in a longstanding pattern of conduct that generated revenue by facilitating that trafficking.

79. Andrews-Akshar also knew or should have known about the sex trafficking at the Camp Springs Motel 6 based on:

    a. surveillance of the property

    b. internal investigations;

    c. customer complaints;

    d. monitoring of customer feedback;

    e. information received from law enforcement;

    f. and other sources of non-public information available to Andrews-Akshar.

**G6 and Andrews-Akshar Relationship**

80. G6 is a franchisor of the Motel 6 brand and Andrews-Akshar is a franchisee, with the Camp Springs Motel 6 being its property.

81. It is a standard practice in the hospitality industry, followed by Defendants, for Franchisors to set exacting brand quality standards reaching everything from the temperature at which coffee shall be served, to the number of pillows that shall be placed on each bed, to the types of funds accepted, to when, where and how guests should be greeted.

82. Franchisors provide their branded properties with signage on and in front of the building intended to assure customers that, if they check into that hotel, they can expect an experience consistent with the standards of the parent hotel brand. The same brand is emblazoned on everything in the hotel, from the pens on the bedside table to the staff uniforms at the front desk.

83. Defendants provide their branded properties branded name recognition, a marketing campaign, and hotel listings in the Global Distribution System and other online travel agency databases, as well as hotel locations with access to their brand-wide central reservation systems, 800 numbers, revenue management tools, brand loyalty programs, and company websites. Thus, booking and room reservations are to a large extent controlled

Complaint

by the G6 for its Motel 6 locations. Defendants see booking and reservation trends, including for those branded hotels where Plaintiff was trafficked

84. Upon information and belief, G6 require its branded hotel properties to use a property management system, which is linked to its corporate network and data center, for, among other things, receiving reservations, and processing credit card transactions.

85. Upon information and belief, per the relevant franchise agreements, G6 may enforce its brand standards by means of periodic inspections of their brand hotel locations, backed up with the ultimate threat of termination of the franchise agreement.

86. It is further a standard practice in the hospitality industry, and therefore, upon information and belief, G6 exercises significant control over the employment decisions of their hotel locations, including the Camp Springs Motel 6.

87. G6 has promulgated policies, procedures, and standards governing the hiring, training, retention, and advancement of on-the-ground employees and setting their rates of pay, which together exert significant control over all employment decisions made at the individual hotel location where Plaintiff was trafficked.

88. Under federal labor regulations, G6 and Andrews-Akshar are each considered joint employers of the employees at the Camp Springs Motel 6.

89. G6 exercised day-to-day control over the Motel 6 and its other brand hotels through centralized corporate systems, training, policies, and brand standards. G6 implements and retains brand hotel control over, including control over the Camp Springs Motel 6 where Plaintiff was trafficked, as either direct subsidiaries or under the terms of its franchise agreements.

90. Upon information and belief, G6 controlled the operations of the Camp Springs Motel 6 through a variety of means enforced through franchise agreements and related contracts, including but not limited to:

    a. Requiring the Camp Springs Motel 6 to use G6's centralized property management, data management, and reservation and billing systems;

    b.   Gathering reports of data generated by Camp Springs Motel 6 including guest information, reservation, payment, and occupancy information through G6's centralized systems;

    c.   Conducting regular quality assurance inspections and audits for compliance with franchise agreement terms and G6's rules and regulations;

    d.   Requiring Camp Springs Motel 6 to purchase products through G6's e-procurement marketplace system or from approved suppliers;

    e.   Requiring Camp Springs Motel 6 to pay fees based of the percentage of gross room revenues;

    f.   Providing advertising requirements and standardized marketing services;

    g.   Requiring the Camp Springs Motel 6 to use approved vendors for internet services or other requirements for cybersecurity and technology;

    h.   Requiring all fixtures, furnishings, equipment, signs, services, materials, and supplies to meet G6's strict standards and specifications;

    i.   Regulating employment policies at the Camp Springs Motel 6 including training and orientation materials for staff;

    j.   Requiring the Camp Springs Motel 6 to make modifications upon G6's request and to refrain from make substantial changes without G6's permission;

    k.   Regulating the rates for room rentals; and

    l.   Setting insurance coverage requirements.

91. G6 manages corporate and branded property training, policies, and procedures on human trafficking, cybersecurity, guest preferences, reward programs, internet access, hotel furniture, amenities, food and beverage, cleanliness, and/or other hotel brand related policies published and communicated via property management systems with back-end management by G6.

92. G6 controls uniform and required reservation, marketing, customer support systems and loyalty programs at its branded hotels through national press releases, newsletters, emails, announcements on G6's website, and mentions across its corporate media channels.

Complaint

93. G6 requires the Camp Springs Motel 6 to use a centralized, cloud-based reservation and property management system.

94. G6 gathers data from its customers including names, payment information, reservation history, browsing data, other details associated with their stay for promotional and guest safety reasons

95. G6 requires its hotels to carry Wi-Fi internet access with certain cybersecurity measures in place which gives G6 the ability to access, monitor, and harvest that internet data.

96. G6 requires branded properties to comply with its corporate policies relating to Safety and Security, Codes of Conduct, Ethics, Economic, Social, Governance, and compliance with the law.

97. G6 participated directly in aspects of the operation of the subject Motel 6 that influenced whether and to what extent trafficking occurred at the hotel, including but not limited to the trafficking of Plaintiff as follows:

   a. The G6 Defendants have publicly assumed responsibility and control over the human trafficking response of all Motel 6, including design and implementation of practices to prevent trafficking, safety and security procedures, employee and franchisee education, training, and response, partnership with external organizations, and advocacy.

   b. The G6 Defendants retained control over when its branded hotels would share information with law enforcement and when law enforcement would be contacted about suspected criminal activity in G6 branded hotels.

   c. The G6 Defendants retained control over the response to trafficking by creating a reporting hotline for hotel staff and franchisees to report suspected human trafficking to the G6 Defendants. The G6 Defendants determined when issues should be escalated to the National Human Trafficking Hotline or law enforcement.

   d. The G6 Defendants retained control over determining which hotels needed additional training or other resources based on a high risk of human trafficking and other related criminal activity.

e.  The G6 Defendants expressly retained control to terminate hotel staff and/or a franchising agreement based on the response to human trafficking.

f.  The G6 Defendants retained control, at the brand-wide level, over training on how to spot the signs of and help prevent human trafficking. The G6 Defendants determined whether the training is provided, when it is provided, the content of the training, how the training is delivered, who receives the training, and the consequences if someone does not participate in the training or fails to follow such training.

g.  Although they delayed making any reasonable effort to do so, the G6 Defendants acknowledge that they retain control to adopt requirements for franchised hotels specifically designed to prevent human trafficking and other criminal activity.

h.  The G6 Defendants maintain a Safety & Security Team and a Critical Incident Rapid Response Team that are charged with investigating and responding to potential criminal incidents at all Motel 6 and Studio 6 properties, including suspected trafficking incidents.

i.  The G6 Defendants are responsible for adopting, enforcing, and monitoring policies and codes of conduct related to human trafficking at the subject Motel 6.

j.  The G6 Defendants maintained control over all details of the terms under which franchised hotels, including the subject Motel 6, offered internet services to customers, including dictating the software, hardware, and service provider to be used, setting all policies about use and restrictions on use, and actively collecting and monitoring guest internet usage data. The G6 Defendants dictated whether sites frequently used to solicit clients for sex trafficking victims would be accessible through the internet at the subject Motel 6.

k.  The G6 Defendants retained control over the setting, supervision, overseeing, and enforcement of detailed policies and protocol for housekeeping services at the Motel 6, including policies for how often rooms must be entered, how to respond to guest refusals of entry into rooms, and steps to monitor guest safety issues through housekeeping services.

24

l.  The G6 Defendants collected, maintained, and analyzed detailed data regarding housekeeping services at the subject Motel 6, including trends that would reveal patterns consistent with human trafficking.

98. G6 played a central role in renting rooms at the subject Motel 6 by, among other things:

a.  The G6 Defendants controlled all details of the guest reservation, check-in, and payment processes through management and control over all systems used for those processes and adoption of detailed and specific policies governing the means and methods used for each of these processes.

b.  The G6 Defendants directly made reservations for rooms at the Motel 6 and accepted payment for those rooms through a central reservation system that they controlled and operated. The G6 Defendants could reserve rooms and accept payments without requiring Franchisee approval or involvement.

c.  The G6 Defendants established and maintained control over a brand-wide "do not rent" system. The G6 Defendants set all policies related to use of this system and dictated the day-to-day details of reservations at the Motel 6 through detailed policies that it established regarding use of this "do not rent" system.

d.  The G6 Defendants controlled room rates, required discounts, mandatory fees, and rewards programs.

e.  The G6 Defendants controlled and restricted the ability of franchisees and staff to refuse or cancel a reservation.

f.  The G6 Defendants controlled and oversaw policies and procedures regarding check-in, payment and identity verification procedures.

g.  The G6 Defendants collected, retained, monitored, and analyzed detailed data about every guest who stayed at the subject Motel 6.

h.  The G6 Defendants established detailed policies and protocol that dictated, step-by-step, everything that would happen from the time a guest arrived at the subject Motel 6. until they entered their guest room. This included operational directives regarding payment methods, identification requirements, the number of guests that could be in each room and whether information needed to be collected for each

Complaint

guest, what questions hotel staff should and should not ask, and other matters related to check-in.

i.  The G6 Defendants required franchisees to use G6's property management system, which was owned, maintained, controlled, and operated by the G6 Defendants, for virtually all aspects of hotel operations regarding room reservations and payment.

j.  The G6 Defendants oversaw do not rent (DNR) lists for their branded properties.

## FIRST CAUSE OF ACTION: TVPRA

Trafficking Victims Protection Reauthorization Act ("TVPRA") 18 USC 1595

(against all defendants).

99. The civil remedy provision of the federal human trafficking statute is found at 18 U.S.C. § 1595 and it reads:

> An individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator (or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter123) in an appropriate district court of the United States and may recover damages and reasonable attorney's fees.

100.    Thus, the federal sex trafficking statute consists of four elements: (a) the defendants(s) knowingly benefitted, (b) from participation in a venture, (c) the venture violated the TVPRA, and (d) the defendant(s) knew or should have known the venture violated the sex trafficking statute.

## Claim 1: Andrews-Akshar Liability

## Knowingly Benefitted

101.    Andrews-Akshar knowingly benefited, financially, by renting rooms to Plaintiff's traffickers.

**Participation in a Venture**

102.    Andrews-Akshar owned, supervised, managed, controlled, and/or operated the motel at which Plaintiff was trafficked, and continuously (for years), rented rooms to Plaintiff's trafficker, demonstrating a continuous business relationship.

**The Venture Violated the TVPRA.**

103.    The commercial venture of renting rooms, including renting rooms to the Plaintiff's trafficker, violated the TVPRA by harboring the sex trafficking activities.

**Actual or Constructive Knowledge.**

104.    Defendant was well aware of the prevalence of sex trafficking generally at its motel but, nonetheless, failed to take adequate steps to prevent its occurrence. This, combined with the many pieces of evidence and signs that should have alerted it to Plaintiff's trafficking gave the Defendant constructive, if not actual, knowledge of the sex trafficking of Plaintiff.

**Claim 3: G6 Liability**

**Knowingly Benefitted**

105.    G6 knowingly benefited, financially, by renting rooms to Plaintiff's traffickers.

**Participation in a Venture**

106.    G6 (1) profited from the rooms her traffickers rented and failed to implement adequate trafficking prevention training programs; (2) collected room reservation, identification, payment, and sex trafficking website data from the trafficker's use of hotel Wi-Fi; and (3) had expansive control over franchisee policies and operations but did not use that power to hold the franchisees accountable.

107.    G6 was involved in a business venture with Andrews-Akshar, and both groups benefited by renting rooms to traffickers despite having at least constructive knowledge of ongoing trafficking based on the totality of the circumstances.

Complaint

**The Venture Violated the TVPRA.**

108.        The commercial venture of renting rooms, including renting rooms to the Plaintiff's trafficker, violated the TVPRA by harboring the sex trafficking activities.

**Actual or Constructive Knowledge.**

109.        Defendant was well aware of the prevalence of sex trafficking generally at their hotels but, nonetheless, failed to take adequate steps to prevent its occurrence. This, combined with the many pieces of evidence and signs that should have alerted them to Plaintiff's situation gave the Defendant constructive knowledge of the sex trafficking of Plaintiff.

**Vicarious Liability**

110.        Defendant G6's exercise of day-to-day control over the Camp Springs Motel 6, including requiring the franchisee to, among other things: (1) use G6's property management system; (2) use their centralized reservation system; (3) submit to periodic inspections with threat of termination; (4) gather reservation, payment, and occupancy data through their centralized system; (5) use approved Wi-Fi and security vendors; (6) comply with their regulated room rental rates; (7) share of profits; (8) control training and policies; and (9) adhere to other brand standards and corporate policies with respect to ethics and safety, demonstrates sufficient control over the franchisee to demonstrate an agency relationship and vicarious liability for the actions of the franchisee.

### SECOND CAUSE OF ACTION: CAVRA

Child Abuse Victims Rights Act ("CAVRA") 18 USC 2255 (against all defendants)

111.        Federal law provides civil remedies for victims of child exploitation by way of a statute commonly referred to as "Masha's Law." The statute provides a cause of action for minors who were a victim of a violation of enumerated federal laws, including 18 U.S.C. § 1591.

Complaint

112.     Defendants G6 and Andrews-Akshar knowingly benefitted from harboring Plaintiff, pursuant to 18 U.S.C. 1591(a)(1), by providing her and her trafficker rooms in hotels that they own, operate, and oversee, under the circumstances where they knew that Plaintiff, a minor, would be caused to engage in commercial sex acts.

113.     Wherefore, by reason of the foregoing, Defendants are jointly and severally liable to Plaintiff for compensatory damages and for punitive damages, in the amount to be determined at trial, together with interest and costs.

## THIRD CAUSE OF ACTION: NEGLIGENCE

### (against G6 and Andrews-Akshar)

114.     These defendants have a heighted duty of care to invitees, such as Plaintiff, who stay at their hotel.

115.     As alleged above, sex trafficking was a reasonably foreseeable occurrence at the defendants' motel from their knowledge and past experiences that persons on the premises would suffer serious bodily harm as a result of being victimized crimes perpetrated by third parties on the premises and that they should have known for more than a decade that sex trafficking runs rampant at their motels.

116.     Additionally, G6 is vicariously liable for the negligence of its agent(s) Andrews-Akshar.

## PRAYER FOR RELIEF

Plaintiff prays for judgment to be entered for Plaintiff against Defendants, jointly and severally, for the actual, compensatory, and punitive damages as the evidence may show and the jury may determine to be proper, together with the costs of suit, prejudgment interest, post-judgment interest, attorneys' fees, and such other and further relief to which Plaintiff may show herself to be justly entitled, at law or in equity.

## JURY DEMAND

In accordance with Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands a jury on all the issues so triable.


Dated: <u>February 24, 2026</u>

*/s/ Marlene J. Goldenberg*
Marlene Jaye Goldenberg, Esq., SBN 31874
**Nigh Goldenberg Raso & Vaughn, PLLC**
14 Ridge Square NW, Third Floor
Washington, DC 20016
Phone: +16123086551
Email: Mgoldenberg@nighgoldenberg.com

Mark Potter, Esq., *(pro hac vice forthcoming)*
Russell Handy, Esq., *(pro hac vice forthcoming)*
Naomi Butler, Esq. *(pro hac vice forthcoming)*
Cara Townsend, Esq., *(pro hac vice forthcoming)*
**Potter Handy LLP**
100 Pine Street, Ste 1250
San Francisco, CA 94111
Phone: (415) 534-1911
Email: ServeHT@potterhandy.com


*Attorneys for Plaintiff*

Complaint